UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-11856-RGS

FRESENIUS MEDICAL CARE HOLDINGS, INC.

v.

LUPIN LIMITED AND LUPIN PHARMACEUTICALS, INC. and ZYDUS
PHARMACEUTICALS USA, INC.

MEMORANDUM AND ORDER
ON CLAIM CONSTRUCTION

June 11, 2012

STEARNS, D.J.

The two patents-in-suit teach medicinal capsules used in the treatment of patients with chronic renal failure. The first patent, U.S. Patent No. 6,576,665 (filed Apr. 3, 2001) ('665 patent), entitled "Encapsulated calcium acetate caplet and a method for inhibiting gastrointestinal phosphorous absorption," was issued on June 10, 2003. The second patent, U.S. Patent No. 6,875,445 (filed Oct. 24, 2002) ('445 patent), shares the identical title and was issued on April 5, 2005. Before the court are the parties' briefs on claim construction.[1] The court held a hearing on claim construction on June

---

[1] The court previously construed five claims in these two patents during nearly identical litigation between Fresenius Medical Care Holdings, Inc. (Fresenius) and Paddock Laboratories, Inc., and Amneal Pharmaceuticals, Inc. *See Fresenius Med. Care Holdings, Inc. v. Paddock Labs., Inc.*, 742 F. Supp. 2d 158 (D. Mass. 2010).

4, 2012.

## BACKGROUND OF THE INVENTION

The court will repeat the summary of the invention that it offered in construing claims in the prior suit. *See Fresenius*, 742 F. Supp. 2d at 160-161. A common problem confronting patients with chronic renal failure is the development of hyperphosphatemia, an excess of phosphate in the bloodstream. '665 patent, Col. 1, ll. 29-30. Hyperphosphatemia frequently leads to additional complications such as secondary hyperparathyroidism and osteodystrophy. *Id.*, Col. 1, ll. 31-32. Patients who develop these symptoms are typically treated with phosphate binders to reduce the

---

The court declines to reconsider the same claim terms in this action because the arguments offered by Lupin and Zydus with respect to those terms are not materially different from the arguments presented to the court during the prior claim construction litigation. *See KX Indus., L.P. v. PUR Water Purification Prods., Inc.*, 108 F. Supp.2d 380, 387 (D. Del. 2000), citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ("While the court's previous opinion does not have issue preclusive effect against [Defendant] in this case, to the extent the parties do not raise new arguments, the court will defer to its previous construction of the claims."). *See also Texas Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 589 (E.D. Tex. 2002), citing *KX Indus.*, 108 F. Supp. 2d at 387, 389 ("[W]hile courts may defer to previous claim constructions (remembering that in the *KX* action, these were previously construed claims considered by the very judge who construed them), such decisions are made on a case by case basis, at the discretion of the court.").

absorption of phosphates from the gastrointestinal tract into the bloodstream.[2] When administered orally, calcium acetate is the most effective calcium-containing phosphate binder able to contain hyperphosphatemia. *Id.*, Col. 1, ll. 51-54.

Prior iterations of calcium acetate tablets or capsules were less than ideal for end stage renal disease patients because they were bulky in size and difficult to swallow. In addition, the unpleasant chalky taste was difficult to mask. As a result, patients often refused to take the proper doses and resorted instead to (less effective) antacids. *Id.*, Col. 2, ll. 31-44. The inventors sought to formulate a medication that would disguise the unpalatable taste of calcium acetate and compress the medication to ease the swallowing of the dosage amount necessary for an effective treatment regime. *Id.*, Col. 2, ll. 48-54.

Fresenius brought these suits against Lupin and Zydus, as it did against Paddock and Amneal, after defendants each filed Abbreviated New Drug Applications with the Food and Drug Administration, seeking approval to market generic versions of Fresenius's PhosLo gelcaps, which practice the patents-in-suit.

## CLAIM CONSTRUCTION

---

[2] Phosphate binders are compounds that bind phosphate in the stomach and intestines, helping to clear phosphorous from the body before it is absorbed into the bloodstream.

Claim construction is primarily a question of law for the determination of the court. *See Markman*, 517 U.S. at 388-389. "It is a 'bedrock principle' of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc), quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). While the specification will generally be dispositive in determining the meaning of particular claim terms, the court may also look to the prosecution history as intrinsic evidence and, as a last resort, to extrinsic evidence. *See Phillips*, 415 F.3d at 1315, 1317. The patent specification "'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315, quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Although it may not be as authoritative as the specification, the prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention [in the specification] will be, in the end, the correct construction." *Id.* at 1316, citing *Renishaw PLC v. Marposs Societa' per Azioni*, 158

F.3d 1243, 1250 (Fed. Cir. 1998).

Claim construction "ascribes claim terms the meaning they would be given by persons of ordinary skill in the relevant art at the time of the invention." *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1283 (Fed. Cir. 2005). The court "indulge[s] a heavy presumption that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (internal citations omitted). According to Fresenius, one of ordinary skill in the relevant art (formulation and manufacture of solid oral dosage forms) would possess either a Bachelor of Science degree in pharmacy or a Doctor of Pharmacy degree, and have at least two years of postgraduate experience working on the formulation of pharmaceutical products, including solid oral dosage delivery systems.[3]

1.   **"Compressed to form a caplet"**

---

[3] In the alternative, Fresenius states that the person skilled in the art could have earned a Bachelor of Science degree in a discipline related to pharmacy (for example, chemistry or chemical engineering), and have at least four years of post-graduate experience working on the formulation of pharmaceutical products, including solid oral dosage delivery systems.

Claim 1 of the '665 patent recites

> [a] composition for binding phosphorous within the gastrointestinal tract of an individual, the composition comprising:
>
> a quantity of calcium acetate sufficient to bind the phosphorous in the gastrointestinal tract of the individual,
>
> the calcium acetate having a bulk density of between about 0.55 kg/L and about 0.75 kg/L, and
>
> where the quantity of calcium acetate is **compressed to form a caplet** for fitting within a capsule in a manner which optimizes the volume of the capsule, and
>
> where at least about 85% of said compressed calcium acetate dissolves in not more than 15 minutes when tested according to USP standard # 24, test # 711 at 50 to 100 RPM, apparatus 1 or 2.[4]

Col. 5, ll. 31-44 (emphasis added).

Fresenius contends that the term "compressed to form a caplet" should be construed consistently with the court's prior construction of the word "caplet." *See Fresenius*, 742 F. Supp. 2d at 164 (a "caplet" is "a capsule-shaped tablet with sufficient integrity to survive insertion into the capsule delivery vehicle."). The phrase "compressed to form," Fresenius argues, should be given its ordinary and customary

---

[4] "USP" refers to the United States Pharmacopoeia, which is described in the specification as "a widely recognized organization that sets some of the standards that pharmaceutical manufacturers must meet to sell their drugs." '665 patent, Col. 2, ll. 12-15.

meaning, that is, that no term in the phrase other than "caplet" need be given further definition.

Defendants offer alternative constructions of their own. Both Lupin and Zydus argue that the phrase should be amplified to describe the method by which the end product (the caplet) is produced. Lupin would have the court say, "placing the unit dose of the powdered composition in a cavity and applying sufficient pressure to form a capsule shaped tablet that will hang together, dissolve properly, and not fracture during handling." Zydus would be even more specific by defining the result as "a capsule-shaped tablet, that is a caplet, [formed by] using a tablet compression machine."

The crux of the disagreement centers on the significance defendants give to the word "tablet" in the court's construction of "caplet," and its relationship to the process used to compress the calcium acetate. Both Lupin and Zydus contend that the word "tablet" connotes the use of a high degree of pressure that can only be achieved (as Zydus would have it), by using a "tablet compression machine."

In covering the same ground in the prior litigation, the court stated then, and does again now, that the patent does not require that the caplet share all of the characteristics typical of a tablet (oval shape, smooth surface, and tamper resistance). The court instead found that "[w]hat is important to Fresenius is that the mass coheres long

7

enough without 'capping' or 'picking' so that the entire dose can be inserted into the capsule without incident."[5] *Id.* at 163. The caplet need not survive in an independent dosage form, which is what distinguishes it from a tablet. The patent term, as construed, thus does not require compression of the calcium acetate under high pressure, only enough pressure to maintain the "integrity [of the aggregate mass] to survive insertion into the capsule." *Id.* at 164.

This construction is consistent with the prosecution history, during which Fresenius told the examiner that "[i]n order to dissolve, a caplet must wet and then disintegrate. The more tightly compressed a powder is, the more difficult it may be to effectively dissolve it. Caplets that do not dissolve properly or fracture during handling are not acceptable." July 18, 2002 Amendment to the Application Remarks at 9, Lupin Ex. B (Dkt # 49). The patent term, in other words, describes a "sweet-spot" for the compression process in which calcium acetate is packed tightly enough to survive insertion into the capsule without losing any of the intended dose, but not so tightly that it is unable to dissolve efficiently when it reaches the digestive tract.

In a post-hearing memorandum, Zydus elaborates on its argument that it is not

---

[5] "Capping" is the splitting along a plane parallel to the long axis of the capsule. "Picking" is the loss of small punctuate flecks of material from a surface.

enough that the caplet be sufficiently compressed to survive insertion into the capsule. Zydus insists that the caplet must also remain in its "hard-pressed" form while it travels (inside the capsule) down a patient's throat, and that only after reaching the gastrointestinal tract, or the stomach, is the caplet to begin dissolving. To support this argument, Zydus points to the "description of an illustrative embodiment" in the '665 patent that states:

> [t]he calcium acetate composition of the present invention is optimally dimensioned to form a delivery vehicle comprising a tablet, a capsule or a caplet. Of these delivery vehicles, *capsules* are preferred as they *completely coat and envelop the caplet until the capsule reaches the gastrointestinal tract,* or stomach.

'665 patent, Col. 4, ll. 22-27 (emphasis added by Zydus).

Zydus urges that the latter sentence is meant to teach one of ordinary skill that to practice the patent the caplet must remain intact until the capsule reaches the stomach. Zydus concedes in its post-hearing brief that there is no rigidly prescribed level of compression required to produce a caplet, but insists that the compression be sufficient to produce a caplet hard enough to avoid capping before the digestive process begins. At the hearing, Fresenius's counsel countered that capping was a concern to the inventors only *prior* to the insertion of the caplet into the capsule. As counsel pointed out, the mechanism for ensuring the delivery of the dose to the gastrointestinal tract is not the caplet, but the capsule in to which it is inserted. The court finds this

explanation more consistent with the physical realities of administering the dosage, and also more faithful to the discussion of the capping issue in the prosecution history.

The court construes "compressed to form a caplet" as meaning: "applying pressure to the unit dose of the calcium acetate composition so that it forms a capsule-shaped tablet with sufficient integrity to survive insertion into the capsule delivery vehicle."

2.   **"Caplet for fitting within a capsule"**[6]

Fresenius argues that this term should be construed in accordance with the court's previous construction of "caplet" and "capsule,"[7] or in the alternative, that it be given its ordinary and customary meaning. Zydus agrees with both propositions, although Lupin advocates for construing the term as "the capsule-shaped tablet (that will hang together, dissolve properly, and not fracture during handling) optimally fits within and substantially fills a capsule." Again, this ground was covered during the prior litigation. Fresenius explained then that the calcium acetate caplet (unlike a

---

[6] This term appears in claim 1 of the '665 patent, which is recited above.

[7] Capsule was previously construed as "a capsule within a size range consistent with what a human patient with chronic renal failure can manipulate and swallow." *Fresenius*, 742 F. Supp. 2d at 166.

Tylenol caplet), is meant to survive on its own only until insertion in the capsule, after which the capsule protects the integrity of the caplet's dose. *See* Sept. 15, 2010 Hr'g Tr. (Tr.) at 21-22. The claim term, as it is presented in claim 1 of the '665 patent, explains that the purpose for compressing the calcium acetate is "for fitting within the capsule." The *manner* in which the caplet is intended to fit within the capsule ("a manner which optimizes the volume of the capsule . . .") is redundant to the construction of the term preceding it ("for fitting within a capsule"). *See Old Town Canoe Co. v. Glenwa, Inc.*, 55 Fed. App'x. 918, 921 (Fed. Cir. 2003) (giving claim term "hull" its ordinary meaning because "the plain meaning of 'hull' does not include a particular shape (V) because otherwise the phrase 'V-shaped hull portion' would be redundant."). The court therefore construes the term "caplet for fitting within a capsule" to have its plain and ordinary meaning in the context in which it appears.

3.   **"Optimizes the volume of the capsule"**[8]

Fresenius and Zydus agree that this term should be read consistently with its ordinary and customary meaning. Fresenius, in the alternative, is willing to accept Lupin's proposed construction: "a caplet that fills the internal volume of a capsule substantially completely," minus the qualifying phrase: "a caplet that." To support its

---

[8] This term appears in claim 1 of the '665 patent, which is recited above.

position, Lupin refers to the specification of the '665 patent, which explains that "[t]he calcium acetate composition is dimensioned to form a caplet for fitting within a capsule in a manner that optimizes the volume of the capsule, i.e., fills the internal volume of the capsule substantially completely." '665 patent, Col. 3, ll. 10-14.

It is settled law that while "one may not read a limitation into a claim from the written description, . . . one may look to the written description to define a term already in a claim limitation, for a claim must be read in light of the specification of which it is a part." *See Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) (citation omitted). The claim term "in a manner which optimizes the volume of the capsule," is defined in the specification by the phrase "*i.e.*, fills the internal volume of the capsule substantially completely." '665 patent, Col. 3, ll. 10-14 (emphasis added). The use of "i.e." is in its definitional sense, as opposed to an exemplary usage. *Cf. Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1326 (Fed. Cir. 2012) (To determine whether use of "i.e." was definitional or exemplary, "[i]t is necessary to consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the patent internally consistent.") (citations omitted). Here, "i.e." is used several times in the specification to define the term "in a manner that optimizes the volume of the capsule." '665 patent, Col. 5, ll. 10-12; Col. 6, ll. 41-43. It does not appear elsewhere, and can be contrasted

with the use of "e.g.," as an exemplary phrase.[9]

Where Fresenius parts company with Lupin is over the prefatory phrase "a caplet that . . . ." Fresenius argues that once the calcium acetate composition (caplet) is inserted into the capsule, it is irrelevant whether the optimization of the capsule is achieved by the calcium acetate remaining in its "capsule-shaped tablet" form. What is important to optimizing the volume of the capsule is the use of a compressed form of the drug in order to insert the proper dosage into an easily swallowable capsule. According to Fresenius, the calcium acetate need not remain in "caplet" form once the dose is inside the capsule.

During the prosecution of the '665 patent, the examiner noted that the prior art did "not disclose that a particular range of bulk density of calcium acetate is compressible to form a composition that is optimally dimensioned to fit within a #0 or #2 capsule." Jan. 28, 2002 Amendment to the Application Remarks at 7, Lupin Ex. B (Dkt #49). After an initial rejection, Fresenius explained to the examiner that "[b]y compressing the calcium acetate to form a caplet having the size and shape that optimally fills the volume in a smaller standard capsule as recited in the independent

---

[9] For example, the specification discussed the benefits of the invention noting that it would "thereby reduc[e] the risks of adverse effects (e.g., bone disease and hyperparathyroidism) observed in individuals (e.g., chronic renal patients) in whom the ability to excrete phosphorous in the urine is impaired." *Id.*, Col. 5, ll. 1-3.

13

claims, Applicants have overcome the disadvantage of the unpleasant bitter taste, while administering the dose in a more easily ingested capsule." July 18, 2002 Amendment to the Application Remarks at 8, Lupin Ex. B (Dkt #49). Simultaneously, the prosecution history makes clear that a powder form of calcium acetate inserted into a capsule is part of the prior art, and may not be claimed.

It appears, both from the specification and the prosecution, that while the caplet need not be in an independent dosage form, the invention is distinguishable from the prior art, in part, because of the caplet *form* of the medicine as it *enters* the capsule (as opposed to the prior art, which called for insertion of the calcium acetate in a powder form). The caplet-in-a-capsule dose is meant to pack a greater punch by permitting the insertion of a larger dosage into the capsule. The invention does not, however, require that the calcium acetate, once successfully inserted into the capsule, remain intact until digested by the patient.

The court will therefore construe "optimizes the volume of the capsule" to mean a "calcium acetate composition that, after being formed into a caplet and inserted into the capsule, fills the internal volume of the capsule substantially completely."

4. **"Administering a composition for binding phosphorous"**[10]

---

[10] Claim 12 of the '665 patent recites:

Neither Fresenius nor Zydus believes that this claim term requires construction. Lupin proposes construing it as meaning the "actual administration or providing of a composition directly to a patient in need thereof for binding phosphorous." For support, Lupin looks to the specification language describing calcium acetate as "more effective than any other calcium-containing binder in binding phosphorous" when administered orally, '665 patent, Col. I, ll. 52-55, and that "[t]he method of the present invention comprises administering the calcium acetate composition in the caplet-within-capsule form, to an individual to bind with the phosphorous in their gastrointestinal tract." *Id.*, Col. 3, ll. 16-26.[11]  The weakness of this proposed construction is that

> A method for binding phosphorous in the gastrointestinal tract of an individual, the method comprising at least the step of:
>
> **administering a composition for binding phosphorous**, the composition comprising a quantity of calcium acetate sufficient to bind with the phosphorous in the gastrointestinal tract of the individual, the calcium acetate having a bulk density of between about 0.55 kg/L and about 0.75 kg/L, and
>
> being compressed to form a caplet for fitting within a capsule in a manner which optimizes the volume of the capsule, and
>
> where at least about 85% of said calcium acetate in said capsule dissolves in not more than 15 minutes when tested according to USP #24, test #711 at 50 to 100 RPM, apparatus 1 or 2.

Col. 6, ll. 37-48 (emphasis added).

[11] Lupin also cites to '665 Col. 3, ll. 40-42; Col. 4, ll. 56-66; and Col. 5, ll. 5-15.

15

nowhere in the claims or specification do the qualifying words "actual" or "directly" appear. *See Renishaw PLC*, 158 F.3d at 1248 ("Without any claim term that is susceptible of clarification by the written description, there is no legitimate way to narrow the property right."). It is clear from the specification that the caplet-within-a-capsule form of calcium acetate is meant to be ingested orally by patients in need of its desired effects – effects that are not at issue in this patent.[12]

The court will construe the term "administering a composition for binding phosphorous" according to its ordinary meaning, while accepting Lupin's suggestion that the phrase "to a patient" be inserted for clarification. Thus, the claim will read: "administering a composition to a patient for binding phosphorous."

5. **"Quantity of calcium acetate sufficient to bind the phosphorous in the gastrointestinal tract of the individual"**[13]

Fresenius and Zydus believe that this term needs no construction, although

---

[12] During the patent prosecution, on May 6, 2002, a supervisory patent examiner in a detailed action rejecting claims 1-22 (later amended and allowed) noted that Fordtran (the prior art) "teaches the administration of a composition for inhibiting gastrointestinal absorption of phosphorous." Office Action, Lupin Ex. B (Dkt #49). "[I]n healthy people, the kidneys remove phosphorous from the bloodstream. But if you have compromised kidneys, one of the ways you are treated is you are given phosphorous binders, which, by binding to the phosphorous in the gastrointestinal system, keep it out of the bloodstream and so reduce the load on the kidney." Tr. at 7-8.

[13] This term appears in claim 1 of the '665 patent, which is recited above.

Fresenius will agree to Lupin's construction of the term as "a quantity of the composition that reduces phosphorous absorption in the gastrointestinal tract and/or serum phosphate levels." All parties agree that the calcium acetate composition at issue in the patent contains more than "pure" calcium acetate because excipients and the anhydrous base are added to create the "composition." Thus, "the composition comprising a quantity of calcium acetate sufficient to bind" language must be read in the context of the earlier phrase, "a composition for binding phosphorous." Therefore, it is the calcium acetate *within* the "composition" that binds the phosphorous and operates to reduce absorption of phosphorous in the gastrointestinal tract of an individual. *See* '665 patent, Col. 2, ll. 57-62. To define "calcium acetate" in this claim term as "the composition" would simply add confusion as the claim would then read, "a composition for binding phosphorous within the gastrointestinal tract of an individual, the composition comprising: a quantity of the composition . . . ." The court agrees, however, that adding the reference to reducing "serum phosphate levels" is consistent with the summary of the invention, which reads "[m]oreover, the present invention relates to a method for reducing serum phosphate levels, since phosphorous is bound in the gastrointestinal tract and phosphorous absorption is lower than would

17

otherwise occur." *Id.*, Col. 2, ll. 63-66.[14]

Thus, the court will construe the term "quantity of calcium acetate sufficient to bind the phosphorous" to mean, "a quantity of calcium acetate that binds to phosphorous in the gastrointestinal tract of the individual and reduces phosphorous absorption in the gastrointestinal tract and/or serum phosphate levels."

### ORDER

The claim terms at issue will be construed for the jury and for any other purpose in this litigation in a manner consistent with the above rulings of the court.

          SO ORDERED.

          /s/ Richard G. Stearns
          _____
          UNITED STATES DISTRICT JUDGE

---

[14] The specification also refers to reducing the serum absorption of phosphorous. *Id.*, Col. 4, ll. 56-61.